Matter of Seaver (2005 NY Slip Op 52300(U))

[*1]

Matter of Seaver

2005 NY Slip Op 52300(U) [12 Misc 3d 1171(A)]

Decided on March 22, 2005

Family Court, Saratoga County

Abramson, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on March 22, 2005

Family Court, Saratoga County
In the Matter of JULIA SEAVER, (DOB 10/18/03) SAM SEAVER (DOB 03/20/00) LISA SEAVER (DOB 12/10/01) Children Under the Age of Eighteen Years Alleged to be Neglected by FRANCIS SEAVER and DIANA SEAVER, (Fictitious Names), Respondents.
NA-03735-03

STACEY L. GORMAN, ESQ.
Assistant County Attorney
Attorney for Petitioner
Municipal Center
Ballston Spa, NY 12020 PAUL PELAGALLI, ESQ.
Assistant County Attorney
Attorney for Petitioner
Municipal Center
Ballston Spa, NY 12020
MARK KASSNER, ESQ.
Law Guardian
1334 Union Street
Schenectady, NY 12308
GORDON, TEPPER & DECOURSEY, LLP
Eleanor M. DeCoursey, Esq.
Attorneys for Respondents
113 Saratoga Road
Glenville, NY 12302
KINDLON AND SHANKS, P.C.
Laurie F. Shanks, Esq.
Attorney for Respondents
100 State Street
Albany, NY 12207

Gilbert L. Abramson, J.
D E C I S I O N
The above-captioned matter pertains to neglect, abuse and severe and repeated abuse petitions filed by the Saratoga County Department of Social Services against the parents of the subject children
Both the petitioner and respondents were represented throughout these proceedings by skilled and experienced counsel. The subject children were represented by a concerned, involved and experienced law guardian.
These petitions were tried to fact finding over seventeen (17) days. Twenty-nine (29) witnesses testified. Six (6) doctors testified for the petitioner, all of whom treated the primary subject of these proceedings, the parents' youngest child, Julia. Two doctors testified on behalf of the respondents, the children's pediatrician and a neonatal physician who did not treat any of the children but testified solely based upon her review of Baby Julia's medical records.
The Court received into evidence twenty-three (23) exhibits offered by the petitioner and sixteen (16) exhibits offered by the respondents. Included in petitioner's exhibits were comprehensive records of Baby Julia's treatment with the Capital Region Orthopedic Group, [*2]Sunnyview Rehabilitation Hospital, Ellis Hospital and Albany Medical Center. X-rays of Julia's skull, chest, and arm fractures were also received. Also received where respondents' family photos and radiological reports.
Due to the large number of exhibits received and index of exhibits, identifying codes and brief descriptions are appended to this decision as an Appendix for ease of reference.
The issue before this Court is whether Baby Julia is a "severely abused" child, a "repeatedly abused" child or an "abused" child; and, whether Julia's siblings are derivatively abused or neglected.
Social Services Law Section 384b(8)(a)( I) provides that:
 A child is severely abused if the child has been found abused as a result of reckless or intentional acts of the parent committed under circumstances evidencing a depraved indifference which results in a physical injury that caused a substantial risk of death or serious or protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ .
For the reasons more fully set out below, the Court finds that Baby Julia is a severely abused child.
 Repeated abuse' can be found when a child is found to be abused, and that same child, or another child for whose care the parent is legally responsible was also found to be abused in the preceding five years. Social Service Law Section 384-b(8)(b)(I).
For the reasons more fully set out below, the Court finds that Baby Julia is not a "repeatedly abused" child.
Family Court Act 1046(a)(i) provides that:
. . . proof of the abuse or neglect of one child shall be admissible evidence on the issue of abuse or neglect of any other child of, or the legal responsibility of, the Respondent.
For the reasons more fully set out below, the Court finds that Baby Julia's siblings Sam, b. 3/20/00 and Lisa, b. 12/10/01 are derivatively neglected children.
At the close of proof, counsel were asked to submit written summations and memorandum of law. This process was recently concluded and the summations received and reviewed by the Court.
The Court recites and adopts the summary of medical testimony of Dr. Crowl, Dr. Sanchez, Dr. Adams, Dr. Slavin, Dr. O'Brien and Dr. Narkewicz submitted by the petitioner:
DR. GEORGE CROWL - SUNNYVIEW
Dr. Crowl is a physician who is board certified in pediatrics and physiatry. He attends to all children hospitalized at the Sunnyview Rehabilitation Hospital.
Dr. Crowl treated Julia Seaver from March 15 through April 15, 2004. Julia Seaver was admitted to Sunnyview Hospital with a diagnosis of multiple fractures.
In the course of her stay at the Sunnyview Rehabilitation Hospital, Julia Seaver did not [*3]experience any skin marks other than what would normally be expected. In addition, Julia Seaver did not suffer any fractures while at the Sunnyview Rehabilitation Hospital. Dr. Crowl testified that Julia improved from admission to discharge.
Dr. Crowl also testified regarding neurologic deficits which Julia Seaver was suffering upon her admission to the Sunnyview Rehabilitation Hospital. Dr. Crowl testified that the most common cause of such deficits was injury to the brain. He further testified that some of Julia's symptomatology was consistent with a brain injury caused by lack of oxygen to the brain.
Dr. Crowl also testified that blood in the saliva would be consistent with pulmonary edema.
DR. JAVIER SANCHEZ
Dr. Sanchez is the head of the Albany Medical Center Hospital Pediatric Intensive Care Unit ("PICU"). He has held this position since 1991. Dr. Sanchez is board certified in pediatrics and pediatric critical care. He is a professor of pediatrics at the Albany Medical College. His practice is limited to critical care/pediatrics.
Dr. Sanchez routinely treats traumatic injuries at the Albany Med PICU. Dr. Sanchez testified that he commonly treats pulmonary edema. He further testified that two major causes of pulmonary edema are congestive heart failure and pulmonary edema secondary to obstruction of an airway. He further testified that the obstruction could be external or internal.
Dr. Sanchez also testified regarding his experience with the diagnosis and treatment of osteogenesis imperfecta. He testified that this is usually detected at birth. His experience has been that OI has not been initially diagnosed at the PICU.
Dr. Sanchez also testified regarding his extensive training and experience in diagnosing child abuse.
Dr. Sanchez went on to testify regarding his treatment of Julia Seaver which commenced at the PICU during the late evening on March 8, 2004. Julia was transported by ambulance from Ellis Hospital. Dr. Sanchez referred to the circumstances under which Julia was transported to the PICU at Albany Med as an "apparent life threatening event".
Dr. Sanchez testified that based upon his treatment of Julia until May 15, 2004 and based upon his conversations with various physicians including Dr. Lisa Ribons, a pediatric radiologist, it was his opinion that the apparent life threatening event was caused by someone externally attempting to stop Julia's breathing. He also is of the opinion that the fractures from December, 2003 were the result of non-accidental trauma. Specifically as to the [*4]apparent life threatening event, Dr. Sanchez testified with a reasonable degree of medical certainty that based upon all of his findings and his examinations and treatment of Julia, her airway was not obstructed internally despite the fact that there was evidence of a mucus plug. It is Dr. Sanchez' opinion that Julia's breathing was obstructed externally. Dr. Sanchez also observed a bruise on Julia's left ear and in the proximity of her right thumb. He also noticed a red area on her chest below the rib cage. He also observed right facial palsy and less than full movement of Julia's right arm leading to concern that she suffered an insult to the brain. He further testified that clinically she was showing signs of brain injury.
Dr. Sanchez also ruled out congestive heart failure as a cause of the pulmonary edema. In his opinion the cause was an external obstruction that was relieved. Although he could not testify as to the precise mechanism, it was his opinion that something had been held tight against Julia's face. In addition to ruling out an internal obstruction or a foreign object, he also ruled out vomiting and aspiration as a cause. He also ruled out an infectious disease as a cause. Dr. Sanchez also ruled out osteogenesis imperfecta as a cause of Julia's fractures. Based upon the constellation of signs and symptoms, past medical history and his examinations and treatment of Julia, it is Dr. Sanchez' opinion, with a reasonable degree of medical certainty, that her fractures and the life threatening event were due to non-accidental trauma. It is also Dr. Sanchez' opinion with a reasonable degree of medical certainty that no medical diagnosis will explain the fractures and/or the life threatening event. Non-accidental trauma/physical abuse explains all of the injuries.
Dr. Sanchez further testified that in reaching his opinions he considered Julia's stay at Sunnyview from March 15 to April 15, 2004. Dr. Sanchez and other members of his practice saw Julia repeatedly while she was at Sunnyview. In addition, they frequently spoke with Dr. Crowl regarding Julia's progress and circumstances. Dr. Sanchez confirmed that based upon the observations he made, the observations of other members of his practice, and the observations of Sunnyview staff, Julia clearly did not suffer any additional fractures while at Sunnyview, nor did she exhibit the sort of external bruising or any other skin marks beyond what would normally appear on the skin of an infant who is several months old.
In ruling out osteogenesis imperfecta, Dr. Sanchez testified that he was able to do so even without Dr. Adams genealogical testing since the bone fractures were not in locations that would be consistent with OI.
DR. DARIUS J. ADAMS - CLINICAL GENETICIST
Dr. Adams testified that he ordered a skin biopsy to test for collagen mutations (Tulane University testing). In addition, he ordered a test which was performed in Seattle, Washington. The Tulane University test looks at genes and the Seattle testing looks at mutations, all with the intention of attempting to ascertain whether or not the patient suffers [*5]osteogenesis imperfecta.
The purpose of the skin biopsy test is to rule in or out OI. Dr. Adams further testified that the testing did not find any mutations which would be consistent with osteogenesis imperfecta. Also (Ehlers-Danlos Syndrome) was not found. Dr. Adams further testified that these tests were 85% accurate.
Dr. Adams testified that he initially performed the testing with Tulane which did not detect a mutation. He then forwarded a biopsy to Dr. Byers in Seattle, the later testing ruling out OI with an 85% certainty.
Finally, Dr. Adams testified that it is unlikely that there is some other medical condition which could be the cause of the multiple fractures suffered by Julia Seaver.
DR. JAMES SLAVIN
Dr. Slavin is a board certified orthopedic surgeon with a specialty in pediatric orthopedics. Dr. Slavin testified that greater than 50% of his practice is devoted to the treatment of children. Dr. Slavin testified regarding his experience in the treatment of traumatic injuries and with the diagnosis of osteogenesis imperfecta.
Dr. Slavin testified that he first had contact with Julia Seaver on December 17, 2003 when Francis and Diana Seaver brought Julia to him for an examination. Dr. Slavin examined Julia and took additional x-rays. He also received x-rays from the Albany Medical Center Hospital. The x-rays he reviewed were taken on November 29, December 3, December 9 and his own x-rays on December 17, 2003.
Dr. Slavin testified regarding numerous fractures which he observed from the various x-ray films including a fracture to Julia's skull, her left ulna and radius, a subtle fracture of her wrist on the right side, x-rays of the 5th, 6th, 7th, 9th and probably the 8th ribs on the left side, fracture of both femurs in the area of the knee, fracture of the left distal tibia (ankle area), fracture of the collarbone and a fracture of the skull.
Dr. Slavin testified that he also saw Julia at the Albany Med PICU in March and at his office on April 23, 2004. Based upon his examinations and treatment of Julia, Dr. Slavin testified with a reasonable degree of medical certainty that the fractures were not due to osteogenesis imperfecta. He testified that he had never seen a skull fracture or rib fractures resulting from OI. He also testified that the types of fractures that she suffered were not consistent with osteogenesis imperfecta. He further testified that the quality of Julia's bones were not consistent with OI.
Based upon his examination of Julia in December, 2003, his examination of Julia in the [*6]Albany Med PICU in March of 2003 and his examination of her in his office in April of 2003, as well as his review of the various x-rays taken of Julia and upon his education, training and experience and the fact that Julia did not suffer additional fractures while at Sunnyview, Dr. Slavin testified with a reasonable degree of medical certainty that in his opinion Julia's fractures were caused by non-accidental trauma.
 DR. GERALD O'BRIEN, E.R. PHYSICIAN, ELLIS HOSPITAL
Dr. O'Brien is board certified in internal medicine. Dr. O'Brien testified relative to his examination and treatment of Julia Seaver at the Ellis Hospital Emergency Department on March 7, 2003. He further testified relative to his transfer of Julia to the Albany Med PICU on or about that date.
Dr. O'Brien testified regarding his observation of bruising and bleeding around Julia's lips and mouth. In addition, he observed blood around Julia's gums. He testified that what he observed could not be amoxycillin and was, in fact, blood.
He testified that based upon his examination of Julia, his diagnosis was pulmonary edema. He felt that this was caused by an obstruction to the mouth and nose that was forceful. He further testified that he did not believe that the bruising and bleeding could have been caused by a mask placed over Julia's face to provide oxygen. Dr. O'Brien testified that he found no evidence of an internal obstruction. He further testified that he did not believe that the mucus plug would have caused the pulmonary edema. He further testified that he felt the cause of the pulmonary edema was a smothering incident.
DR. KEVIN KARPOWICZ
Dr. Karpowicz is a board certified pediatrician who has attended to Julia since April 16, 2004 through to the present. Dr. Karpowicz testified regarding the numerous examinations which he has conducted of Julia since that date, with the last examination prior to his November 10, 2004 testimony being October 27, 2004.
In summary, Dr. Karpowicz testified that throughout the time that he treated Julia, the condition of left sided hemiplegia has improved and resolved. In addition, throughout the time that he has treated Julia, she has not suffered from any fractures. Dr. Karpowicz also testified that he has not observed any unusual bruising or other markings, nor has he observed repeated and frequent skin markings in the course of his examinations and treatment of Julia.
These summations are adopted by the Court as a fair and accurate summary of the testimony of those doctors.
[*7]
Similarly, the Court adopts the summations of the Respondent regarding their medical witnesses, Dr. Sood and Dr. Narkewicz as fair and accurate descriptions of those witnesses' testimony. The summations of the medical testimony of Dr. Sood and Narkewicz are set out fully herein:
The respondents also presented the testimony of Sushila Sood, M.D., the board certified pediatrician for all three of the children. First, Dr. Sood testified that Sam and Lisa had been in her care since their birth. She also testified that at the request of the Department of Social Services that she performed a complete physical of Sam and Lisa and that she ordered full skeletal screens of both Sam and Lisa. Both Child Protective Services and the doctor testified that the parents were cooperative in arranging the physicals of Sam and Lisa. The full skeletal screens of both Sam and Lisa were negative for trauma as was the physical exam.
Dr. Sood testified that Sam and Lisa had all their well baby check-ups and immunizations and all appointments had been attended. They were described as healthy, well-cared for children who are closely bonded with their parents.
Dr. Sood has been a pediatrician since 1970, and has treated thousands of children. She testified that three or four doctors in her practice were called in to observe Julia on November 18th, and observed the purpura and tried to determine the cause. She further testified that hemorrhagic vasculitis had never been ruled out, which was a Protein C deficiency noted in the report of Dr. Porter, the hematologist who initially screened Julia. She opined that further testing is necessary.
She testified that Julia had undergone an x-ray on November 29th to determine if any of her ribs were broken, and the x-ray was negative. She also testified that on December 1st, Julia was comfortable, all of her limbs moved and there was no sign of injury when she examined her from head to toe in her diaper. She testified that on the same day she referred the respondents to Dr. Porter, the hematologist. She testified that upon receiving a call from the respondents at Dr. Porter's office immediately thereafter, it was revealed that the child had a red swelling on her head, and the decision was made to send the child to Albany Medical Center.
Dr. Sood also testified and confirmed the Albany Medical Center reports that the skull fracture Julia was later diagnosed with, was not a deep injury, but a superficial fracture, that there was no subdural hematoma, no disruption of the dura and no retinal hemorrhaging. She opined that Julia's fractures were not caused by intentionally inflicted trauma.
In describing Julia's skin findings, she opined that they were not regular bruises, that there was no reaction when touched, that none of the bruises were ever raised, that they were never accompanied by any external injury, that they were all flat under her skin, that they would come and go without pattern and would usually disappear in approximately two days. She testified that a normal bruise caused by trauma would progress from blue, green, yellow [*8]over three to five days and that this was not the case here. She testified that she observed skin markings and colorations on Julia's back, gluts, forehead, chin, legs, between her toes, her chest, her forearms, her ears, her hands and her fingers. Dr. Sood testified that there were symptoms of swelling with no bruising, and with no limited movement and no pain when she moved it. She specifically noted that she observed this on Julia's nose, cartilage and finger.
She testified to Julia's office visit on December 11, 2003. She testified that Julia presented in her office on December 11, 2003, sweaty, bluish-white, with a right index finger swollen. Again, the finger was x-rayed and it was not broken but swollen.
Dr. Sood testified that on December 14th she observed swelling of Julia's head and the area was soft to the touch. She immediately ordered a CT scan, which was again negative for any new fracture. This CT scan was performed at Albany Medical Center Hospital and the child was again discharged from the hospital to her parents. Dr. Sood testified that the Seavers followed all of her recommendations, were attentive and cooperative. Dr. Sood testified that she does not yet have a diagnosis for Julia's condition, but that in her opinion Julia has a collagen vascular disease that is not yet diagnosed. She recommended that Julia be tested further at Shriner's or another hospital where she could undergo collagen testing and a rheumatological work-up. She testified that the petechiae and purpura were not caused by trauma.
Dr. Sood also testified concerning the diagnosis of pulmonary edema. She testified clearly that a finding of pulmonary edema and fractures could be unrelated, and that in her opinion, in Julia's case, they were unrelated. She testified that there are many, many causes of pulmonary edema, including choking on sputum, aspiration, sleep apnea and a mucus plug. She testified she was certain that the parents had not abused the child, that she did not hotline the child, and that the child should continue to be followed by appropriate medical specialists.
Dr. Karen Narkowicz also testified for the respondents. She is a board certified neonatologist and head of the Neonatology Department at St. Peter's Hospital. Dr. Narkowicz testified that she had seen many children in her career and many child victims of abuse. She testified that Julia presented a complex case, of multiple different problems that presented in the first few months of her life. Dr. Narkewicz testified that one diagnosis would not necessarily explain all of Julia's illnesses. Dr. Narkewicz testified that it was medically significant that the skin markings on Julia come and go. She opined that his has a medical condition as opposed to trauma related. The markings were not sensitive to touch, there was no swelling, and they would come and go without following any particular pattern. Dr. Narkewicz testified that this suggested an auto immune response. Dr. Narkewicz testified that she believed the likely explanation was an internal inflammatory process, most likely a vasculitis or genetic defect in the skin. Like Dr. Sood, she testified that these types of [*9]disease are difficult to diagnose and take time to establish.
In testifying regarding the fractures that Julia sustained, Dr. Narkewicz opined that accidental trauma is possible, and that the existence of a collagen disease makes it more likely that Julia could have sustained an accidental trauma without anyone ever being aware that it had occurred. Dr. Narkewicz said that she could not exclude, with a reasonable degree of medical certainty, the possibility of non-accidental trauma, but opined that she would have expected more evidence of trauma had Julia's fractures been intentionally inflicted. She testified that if Julia did not have an underlying condition such as a collagen disorder, the fractures would have shown more evidence of trauma, such as swelling, skin bruising with marks and pain to the baby. Fractures of a normal bone would be picked up on a physical exam, whereas, in the case with Julia, she had been examined by her pediatrician who saw no evidence of bone fracture.
Dr. Narkewicz also testified regarding the March 7th incident wherein Julia was diagnosed with pulmonary edema. Dr. Narkewicz testified again to the many, many causes of pulmonary edema, including apnea, seizure, choking and pneumonia. She testified that in this case, the fact that Julia's stomach had been full prior to bed, the fact that she had an ear infection, and the fact that she was taking Amoxicillin, were all extremely relevant. The reports of Ellis Hospital and the Emergency Medical Technician reveal that a mucus plug had been suctioned out of Julia at the home before the baby was transported. Dr. Narkewicz further opined that this was evidence that the baby choked, rather than asphyxiated. Dr. Narkewicz opined that had the baby been asphyxiated, other organs would be involved, such as the kidney or heart, and the baby would have been extremely ill for a longer period of time.
The non-medical testimony establishes a chronology of events starting December 3, 2003 with a Child Abuse Hotline report regarding Baby Julia. Senior Caseworker, Concetta Hmura advised the "on call" CPA caseworker, Allison Huck, to go to Albany Medical Center where Julia was with her parents. Instructions to Ms. Huck were also to contact the State Police. The hotline report was for a skull fracture, two broken bones in Julia's left arm and bruises. It is noted that there were no hotline reports filed against or about the Seaver family prior to December of 2003. The December 3rd hotline report was ultimately "indicated" by the Department of Social Services for inadequate guardianship with bruises, lacerations and welts.
Julia's parents self-referred to Dr. James Slavin, a pediatric orthopedic surgeon. Dr. Slavin examined Julia on December 17, 2003 and on December 18, 2003 Dr. Slavin contacted Child Protective Services and opined that Julia was an abused child.
Ms. Hmura testified that Diana's initial response to CPS intervention was, "There is a medical reason for Julia's injuries". Francis stated to Ms. Hmura "we are not hurting our daughter". These are the positions that the respondents have maintained throughout these proceedings - that there is a medical reason for Julia's injuries and that they had no [*10]responsibility for causing the injuries. Fran and Diana have never offered any explanation for Julia's injuries other than an undiagnosed medical condition.
On December 26, 2003, abuse and neglect petitions were filed against both respondents. Pursuant to interim orders of the Hon. Courtenay W. Hall, J.F.C,. Julia was directed to be returned home to the custody of the respondents.
Child Protective Services caseworkers, Allison Huck and Jim Shoemaker, provided daily home visits with Julia and the respondents except on days that Julia was being seen by a medical professional.
On March 2nd a second hotline report regarding Julia was indicated for bruises and lacerations. On March 7th, a further hotline report was received alleging that Julia was admitted to Albany Medical Center through the Emergency Room and was admitted to the Pediatric Intensive Care Unit (PICU) for what was reported to be a suffocation injury. Julia was transferred to Albany Medical from Ellis Hospital Emergency via ambulance at approximately midnight on March 7th.
Ms. Hmura went to the PICU with caseworker James Shoemaker. The respondents and the attending physician, Dr. Javier Sanchez, director of the PICU, were interviewed. During this PICU hospitalization, Julia's arms were restrained and she was placed on a ventilator on March 9th. Ms. Hmura testified that in her presence Diana was admonished by the on-duty nurse in the PICU not to stimulate Julia when she was on the ventilator. This was subsequently confirmed by the testimony of that nurse.
Julia was admitted to Sunnyview Rehabilitation Hospital and remained hospitalized from March 15th to April 15th. Dr. Crowl, who attended Julia at Sunnyview, testified that Julia had suffered a brain injury resulting from a lack of oxygen to the brain. He also offered that Julia's other presenting neurological symptoms were also likely attributed to the brain injury.
It is notable that during Julia's month long stay at Sunnyview, no new medical issues presented - no new fractures, bruises, rashes or petechiae. Dr. Crowl testified that Julia's parents asked him several times to observe skin presentations on Julia. Dr. Crowl testified that Diana was pointing out marks and bruises on Julia, but none were found.
On April 15, 2004, Julia was discharged from Sunny view to "Early Intervention".
 Lorraine Martin, a pediatric intensive care nurse for 25 years, testified regarding her contact with the respondents while Julia was being treated at the Albany Medical PICU. Nurse Martin's testimony raises concerns with the Court regarding Diana's intentions and behaviors towards Julia. Nurse Martin testified that her first contact with Diana was on March 9, 2004 in Julia's room. She testified that Diana tried to put the side rail on Julia's crib down and was directed by Nurse Martin not to lower the side rail as that was where Julia's ventilator tubing was attached. Nurse Martin testified that Diana was "startled" at the instruction, and that she did not lower the side railing. As reflected in the nursing notes, Diana actually lowered the rail with the ventilator tube attached the next day. The Court received into evidence two photographs showing Julia's crib on March 9th including a photograph of the ventilator tube in Julia's room.
On March 10th, Nurse Martin saw both respondents with Julia at 11:00 A.M. Nurse [*11]Martin repeatedly warned the respondents not to stimulate Julia, who was intubated, and consistently sleeping. Diana was observed stroking Julia, talking to her and giving her a kiss. Both parents were again cautioned about physically interacting with the baby. One hour later, at noon, Diana was again seen physically interacting with Julia and Nurse Martin again warned against this. Again at 1:00 P.M., with both parents visiting, Fran and Diana were again observed stimulating the baby and a further warning followed. At Diana's next visit at 3:00 P.M., further stimulation of the baby was observed and further warnings were stated. Upon waking, Julia was observed to be struggling against the restraints and the ventilator. This negative physical reaction appears to the Court to be the basis for Nurse Martin's repeated directions not to physically stimulate the baby.
On March 11th, Julia was extubated as she was breathing on her own. Fran and Diana were able to change Julia's diaper and hold her in a rocking chair.
On March 12th Diana was able to feed Julia, however, Nurse Martin noted that Diana did not ask to hold Julia. She testified that based upon her experience, most mothers would have asked to hold their baby. On that day Diana ultimately held Julia for a few minutes and returned her to her crib. Julia began to vomit and Nurse Martin asked Diana to burp Julia, but Diana declined. Nurse Martin testified that "that was odd".
On cross examination Nurse Martin testified that on March 11th, Fran visited with Julia until 11:45 P.M. and that Fran was having a "positive and loving" interaction with the baby. This is reflected in the nursing notes of that day.
Nurse Martin was not the only nurse at the Albany Medical PICU that directed Diana not to lower Julia's crib side rail.
Nurse Heidi Finkle testified that she cared for Julia at the PICU on March 9th, coming on duty after Nurse Martin's shift. Nurse Finkle was advised regarding Diana's attempts to lower the crib rail from Nurse Martin on her shift immediately preceding.
During Nurse Finkle's shift, she testified that Diana yet again tried to put the side crib rail down with the ventilator tube attached. Nurse Finkle testified that, if the side rail was lowered, Julia's breathing tube would be extubated
The Court concludes that the repeated attempts to lower the crib rail was not innocent or accidental conduct even by an emotionally overwrought parent.
Autumn Perrino, a volunteer paramedic from the Clifton Park-Halfmoon Emergency Corps testified regarding her emergency response to the respondents' residence for Julia on March 7th. It is noted that Ms. Perrino is a registered Nurse in addition to serving as a paramedic. Ms. Perrino responded to the call at 7:10 P.M. in her personal vehicle. The dispatch was priority "One Echo" highest priority. She came to the respondents' home with her partner - also an EMT and was welcomed in by Fran. Upon entering, she noticed two elderly people in the house with Fran (probably Fran's parents). Diana was in the master bedroom lying on the floor on her side next to Julia who was on her back. Autumn put a non-rebreather on the baby and examined Julia. She found that Julia's heart rate was 100 which was "borderline low" and her respiration was 50 with shallow breathing. Autumn testified that the rate of respirations was "elevated" with 30 being normal for an infant. She testified that Julia had an intermittent weak cry and she observed that Julia was not breathing [*12]well. Upon performing a head to toe examination of the baby, Autumn found Julia to be pale, with no obvious deformities. Autumn asked Diana if there were any medical problems. Diana replied "no". Julia was taken by ambulance to the Ellis Hospital Emergency Room, where she arrived at 7:40 P.M. At the Ellis Hospital Emergency Room, Autumn heard Diana state to the intake nurse "I have information" which she gave to that nurse. Autumn testified that she observed bright pink secretions on Julia which she believed to be Amoxycillin and saw some blood streaks with these secretions.
The next day Autumn was approached by a State Police Investigator Detective to whom she gave a written deposition. This deposition was received into evidence without objection.
In addition to Concetta Hmura and Allison Huck, DSS caseworkers Tina Griswold and Melissa Moczydlowsky, testified regarding hospital and home visits on this case. Ms. Griswold confirmed to the location of the ventilator tube in Julia's crib at the PICU and a single attempt by Diana to lower the crib rail, repeating Diana's remark that "I only wanted to give her a kiss". She also testified on cross examination of Diana's upset at the news from Dr. Sanchez at the hospital that "the baby is not getting any better, nor is she getting any worse". When asked if Diana was crying at this report, Ms. Griswold testified "not at that time, but later".
CaseworkerMoczydlowsky testified to home visits with the respondents and Julia in early March of 2004. The visits were uneventful, the respondents were cooperative and Julia appeared "fine".
Respondents' case offered several witnesses who can be characterized as friends, neighbors and admirers of the respondents. Lisa Campbell, a neighbor and close friend of the respondents, is a school psychologist and a mandated child abuse reporter under Social Services Law Section 422. She has two children who are friends with the respondents' older children. She characterized Diana and Fran as like her "sister and brother". Her children were safe and comfortable in Fran and Diana's home. Lisa characterized Diana as a "positive and enthusiastic person". She testified that Fran and Diana were ecstatic about their pregnancy for Julia and that they were a very happy couple at Julia's birth.
After Julia's birth, Lisa testified that she was at the respondents' home once or twice every day or that Diana was at her house a similar amount. Lisa and Diana shared day care responsibilities with each other. Lisa became aware of Julia's health issues in mid November of 2003. She saw Julia's "grape jelly" skin presentation which was irregular and over 50% of her body. Lisa also testified that Julia had smaller presentations on her head, feet and hands. She testified that Diana and Fran carried Julia on a pillow.
On cross examination Lisa acknowledged that Diana had shingles when pregnant with Julia and that she had precancerous cells during that pregnancy. She was unaware of Julia's clavicle, radius and ulna fractures stating that Diana did not discuss these with her.
Colleen Seburn, the Director of the North County Academy where Sam and Lisa attended pre-school appeared as a subpoenaed witness. Colleen reported favorably on Sam and Lisa, finding them well cared for and well adjusted, remarking that the respondents and the children love each other very deeply. Colleen had only seen Julia three or four times at [*13]the time of her testimony. She saw Diana during her pregnancy for Julia and found her to be optimistic and upbeat. The last time she saw Julia she was wearing a cast but offered no testimony regarding the cause.
Dr. Rebecca Arpe appeared for the respondents. Although a clinical psychologist she testified as a lay witness, not an expert witness. Dr. Arpe's children attend the North Country Academy with the respondents' two older children. She met Diana in May of 2002. Dr. Arpe testified that Diana was eager to get pregnant again and that she wanted a large family. She offered that Diana loved being pregnant and that she and Diana were pregnant about the same time. After their babies were born, they went on walks together with their infants. Dr. Arpe observed red marks on Julia, stating that she never saw anything like it before. Dr. Arpe reported that she observed Diana being very careful diapering Julia during the end of February 2004. She further offered that Fran and Diana have a "really strong marriage" and that they are "amazing parents". She testified that she never saw Diana or Fran lose their patience with their children and opined that Diana is "the best mother I have ever seen". When discussing Julia's injuries, Dr. Arpe repeated that Diana never attributed Julia's injuries to any other person.
Another neighbor, Christine Schultz, testified on behalf of the respondents. Christine has three young children of her own who play with the respondents' children. She has babysat for Sam and Lisa and, in turn, Francis and Diana have watched her children. She confirmed that Diana was eager to be pregnant for Julia.
Christine's children are also patients of Dr. Sood (Sam, Lisa and Julia's pediatrician). On December 11, 2003, she saw Diana with Julia at Dr. Sood's office. She testified that she saw Julia "drenched in sweat" with her eyes rolling back in her head and Diana behaving in a "terrified" manner. Before Christine left Dr. Sood's office, she testified that Julia was "back to normal". Similar to the other friends and neighbors witnesses Christine described Fran and Diana as the "perfect parents".
On cross examination, Christina testified that Diana never discussed any of Julia's fractures or other physical aberrations with her.
Fran's mother, Ellen, then testified to Fran and Diana's delight at their pregnancy for Julia stating that it was a planned pregnancy. Ellen testified that she came to Fran and Diana's residence the day Julia was born. She remained at their home after Julia's birth for several days.
While visiting a week before Thanksgiving, Ellen observed a "couple of purplish blotches" on Julia.
On Thanksgiving, Fran, Diana and their extended family enjoyed the holiday at the respondents' residence. According to Ellen, 15 grandchildren (including the respondents' children) and their parents attended Thanksgiving dinner at the respondents' home. During the meal Julia sat in a car seat on the table and other times would nap in her crib. No testimony was offered that anyone, other than the respondents, handled Julia.
Upon finding out about Julia's medical problems around Christmas, Ellen moved into Fran and Diana's residence for an extended visit. She would help to watch Sam and Lisa when Diana and Fran went to Julia's medical visits. Ellen remained at their home until April. [*14]Ellen testified that she observed grape jelly colored blotches on various parts of Julia's body throughout her stay. Consistently, the marks would only last for a day or two. She testified that Diana modified garments for Julia so that she could get them on and off over her cast. These garments were received into evidence. She testified that when Julia traveled by car, she was always harnessed in her car seat with a shoulder harness and a crotch belt. Ellen confirmed regular CPS visits to Fran and Diana's home several times a week noting that Fran and Diana always cooperated with the caseworkers.
Ellen testified to a birthday party at the house for Sam attended by her, her son Andrew, her son Sam and her daughter Theresa. After the party at 7 P.M. she took Julia upstairs to bed and changed into casual clothes. Ellen testified that shortly thereafter Julia started convulsing and a call to 911 was made. As stated previously, Julia was ultimately taken by ambulance to Ellis Hospital.
It is uncontroverted that at no time prior to Julia's placement in DSS custody was Julia outside of the care and supervision of Diana, Fran or Ellen.
It is of concern to the Court that on cross-examination Ellen disputed the diagnosis that Julia had suffered fractures, however on re-direct she clarified that she disputed the attributed causes of the fractures, joining with the respondents in their contention that Julia was suffering from an "undiagnosed medical condition".
Lorie Urquhart, a Saratoga County Public Health Nurse, testified for the respondents. She met Fran, Diana and Julia via referral from Albany Medical dated December 5, 2003. Her first visit with Julia at Diana's home, with Diana present, was on December 11, 2003. Nurse Urquhart noted a cast of Julia's left arm, swelling on the bridge of her nose, and cold sweats. Swelling on Julia's right index finger was noted as was Diana's careful handling of Julia. Nurse Urquhart testified that her last visit with Julia was on February 27, 2004 with visits occurring weekly and then on alternate weeks.
She testified that in mid-February a "developmental screen" of Julia was done revealing low developmental scales and that Julia's thinking skills were down.
Diana Seaver testified on direct examination by the petitioner. The Court advised Diana that if she elected not to answer certain questions on the advice of her attorney, the Court could draw a negative inference from her exercise of that right. Having been so advised, Diana declined to answer 21 proper questions presented to her by the petitioner. The Court can and does draw a negative inference from Diana's refusal to answer what were meaningful and substantive questions . No inference is drawn from Diana exercising this right in pre-trial depositions.
Diana could offer no explanations for Julia's multiple fractures except to assert that she had a medical condition.
It is established to the satisfaction of the Court that no credible medical theory was offered or established by Diana or any witness presented on behalf of the respondents.
Fran testified to Julia's symptoms including swelling and skin presentations. He testified to his long work hours including some work obligations that kept him away from home overnights. When asked if he discussed Julia's fractures with Diana, Fran replied in the affirmative testifying that he and Diana believed that Julia had a medical condition. Fran [*15]declined to answer four proper and substantive questions on advice of counsel having been advised of the Court's right to draw a negative inference from his exercise of such right. The Court does draw such a negative inference.
At the close of respondents' case, petitioner called three rebuttal witnesses, Dr. Kevin Karpowicz, caseworker Kristina Neel and caseworker Christine McNall.
Dr. Karpowicz was Julia's pediatrician from the time she entered foster care in April 2004 to the present. His first visit with Julia was her first day out of Sunnyview Hospital. Dr. Karpowicz's records were received into evidence. His first visit found Julia to have low muscle tone and that she was under-responsive.
His next visit with Julia on May 7th, found that Julia suffered spasticity (tightness) of the muscles in several areas of her body. His next visit was on June 8th, when Dr. Karpowicz noted less spasticity, testifying that he observed Julia pulling herself up with both hands. He noted Julia to be more interactive with better social reference. Occupational therapy and physical therapy was recommended to assist Julia. Julia was seen to be "mildly asymmetrical" except for her head. At the August 11th "well baby" check up, no asymmetry was noted. Julia was seen by Dr. Karpowicz on September 24th for an ear infection, on October 12th for a cold (the ear infection was gone) and on October 27th for a well baby check. Dr. Karpowicz testified that Julia's neurological exam on October 27th was "fine" with minor non-significant exceptions. He testified that as of her last visit, Julia is doing quite well and he concluded that her growth and development were "excellent".
Of greater importance is Dr. Karpowicz's testimony that Julia had suffered no fractures or petechiae while under his care. Only a small abrasion was noted on Julia's left eyelid which was attributed to a fall at the babysitters.
On cross examination by the Law Guardian, Dr. Karpowicz stated that Julia had a normal reaction to pain from her regular inoculations.
Kristina Neel testified that she supervised visits between Julia and Diana and Fran from April 10, 2004 to September 13, 2004. Visits would occur between two and four times each week lasting an average of one and one half hour period. She testified that the only marks she saw on Julia during these visits was a small circular mark on the inside of Julia's right arm on June 17, 2004. Two other red marks were noted on Julia's head where she was lying down, but those marks went away upon observation.
Kristina testified that on April 20, 2004 Diana asked her to look at marks on Julia's ankle, but none were seen by Kristina. On July 13, 2004, Diana pointed out a bruise to Kristina, but none were observed.
It is troubling to the Court that Diana was finding bruises and discolorations on her child where none could be found by any third parties.
On cross examination, Kristina testified that Fran and Diana had daily access to Julia while she was at Sunnyview Hospital and that Julia was read to, held and rocked by Fran and Diana. Kristina testified that on July 29, 2004, Julia scratched her right arm on a toy and on the May 25, 2004 visit Julia had a small scratch on her face near her mouth. Kristina confirmed that Diana and Fran participated in physical and occupational therapy for Julia and that Julia appeared glad to see her parents on visits.
[*16]
Caseworker Christine McNall took over supervision responsibilities for Kristina Neel when Kristina went out on leave. Her responsibilities ran from August 24, 2004 until November 4, 2004.
She testified to seeing a small brown dot on Julia's armpit, pointed out by Diana, on September 7, 2004 and a red mark on Julia's eyelid on September 28th. Christine attributed the eyelid bruise to Julia hitting herself with a compact disc case while on a car trip with her foster parents on September 25th. On her October 12th visit, Julia was observed to have a bruise by her left eye, reportedly from falling into a corner of a wooden chair. A photograph of this mark was taken.
Christine testified that at her last visit Julia was almost walking and doing some falling. She further testified that Julia had a positive reaction to her parents during the visits she supervised. Additionally, Christine testified that at the end of her supervisory period, Julia no longer required physical or occupational therapy as she had met all of her PT and OT needs.
Based upon a review of the competent evidence, the medical testimony and the relative credibility of the witnesses, the court makes the following findings:
It is adjudged that Julia Seaver is an abused child by a preponderance of the credible evidence; and it is further
ADJUDGED, that Julia Seaver is a severely abused child by clear and convincing evidence; and it is further
ADJUDGED, that the children, Sam and Lisa Seaver, are derivatively neglected children.
The Court finds that the petitioner has made out a prima facie case of abuse as established by the overwhelming and essentially unrebutted medical evidence. Severe abuse has been established by the very nature of Baby Julia's injuries, i.e. multiple rib fractures, long bone fractures and a skull fracture. All of these injuries occurred while Julia was solely in the care and supervision of her parents. Diana and Francis' assertions that Julia's condition and injuries are the result of a medical condition is not established in terms of their testimony, nor is it supported by any competent proof. The Court finds it startling that the respondent's pediatrician, Dr. Sood, a physician of long standing and good reputation in Southern Saratoga County, did not even call in a child abuse hotline report when confronted with her patient's multiple unexplained fractures and repeated injuries. Even the respondents' medical expert, Dr. Narkewitz, testified that upon review of Baby Julia's medical records, she would have called a report in to the State Central Registry of Child Abuse and Maltreatment.
The one medically plausible explanation for Julia's multiple fractures - osteogenesis imperfecta - has been ruled out to the highest available degree of medical certainty which is 85% certainty. To look beyond the available medical science is to consider evidence not before this Court. To do so would be impermissible conjecture which the Court finds is contrary to the safety and well-being of Baby Julia. The Court is satisfied that Baby Julia's injuries were caused by those adults who had exclusive care and custody of her.
The Court makes no findings of repeated abuse, although Julia's injuries occurred over a period of a year. The controlling statute requires a prior finding of abuse within a 5-[*17]year period and no such prior finding has been made.
This most difficult case does not address the issue of "why" Baby Julia was hurt. Motive is not the issue before this Court. The Court finds the descriptions of Fran and Diana as "super parents" and the injuries that their child suffered while in their care to be a chilling study in contrasts.
Counsel for the petitioner shall submit an order consistent with this decision on notice within thirty (30) days.
SO ORDERED.
Dated:Ballston Spa, New York
March 22, 2005
____________________________________
GILBERT L. ABRAMSON
 J.F.C.